IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MONICA TACKITT,<br><br>                 Plaintiff,<br><br>v.<br><br>TREND COMMUNITY, PBC,<br><br>                 Defendant. | CIVIL ACTION NO. _____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT AND JURY DEMAND**

Plaintiff Monica Tackitt, by and through her attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint"):

**PRELIMINARY STATEMENT**

1. This is an action for an award of damages, attorneys' fees and other relief on behalf of Plaintiff Monica Tackitt ("Ms. Tackitt"), a former employee of TREND Community, PBC ("Defendant" or "TREND"). Ms. Tackitt has been harmed by Defendant's discrimination and harassment based on her sex, and by Defendant's retaliation against her for complaining about discrimination and harassment, culminating in her wrongful termination on September 1, 2023.

2. This action is filed pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq. ("Title VII"), the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA"), the Philadelphia Fair Practices Ordinance ("PFPO"), and the common law of the Commonwealth of Pennsylvania.

**JURISDICTIONAL STATEMENT**

3. This Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5. This Court has supplemental jurisdiction over any Pennsylvania state law or local claims pursuant to 28 U.S.C. § 1367.

6. All conditions precedent to the institution of this suit have been fulfilled. On February 27, 2024, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Pennsylvania Human Relations Commission ("PHRC"). On September 11, 2025, the EEOC issued a Notice of Right to Sue to Plaintiff. This action has been filed within ninety (90) days of Plaintiff's receipt of said Notice. With respect to the PHRA claims alleged herein, it has been more than one year since Ms. Tackitt dual-filed her Charge as a Complaint with the PHRC.

**VENUE**

7. This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

8. This action properly lies in the Eastern District of Pennsylvania because the claims and significant activities associated with the claims arose in this judicial district, and Plaintiff was employed by Defendant in this judicial district.

**PARTIES**

9. Plaintiff Monica Tackitt is an adult female individual who is a citizen and resident of Landenberg, Pennsylvania and the United States of America.

10. Defendant TREND Community, PBC is a digital health analytics company with a main office at 30 South 15th Street, Suite 700, Philadelphia, Pennsylvania 19102, where Ms. Tackitt was employed.

11. At all relevant times, Defendant TREND Community, PBC was an employer employing more than fifteen (15) employees.

12. Defendant TREND Community, PBC does significant business within the Commonwealth of Pennsylvania.

13. At all relevant times, employees of TREND Community, PBC acted as agents and servants for TREND.

14. At all relevant times, employees of TREND Community, PBC were acting within the scope of their authority and in the course of employment under the direct control of TREND.

15. At all times material hereto, TREND Community, PBC acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with TREND and in furtherance of TREND's business.

16. At all times relevant hereto, Defendant is and has been an "employer" and/or "person" within the meaning of the laws at issue in this matter, and is accordingly subject to the provisions of said laws.

17. At all relevant times hereto, Plaintiff Monica Tackitt was an "employee" within the meaning of the laws at issue in this matter, and is accordingly entitled to the protections of said laws.

18. This Honorable Court has jurisdiction over Defendant.

**FACTS**

19. Ms. Tackitt first joined TREND Community, PBC in November 2021 as an independent contractor.

20. Due to her excellent performance, in or about June 2022, TREND hired Ms. Tackitt as an employee in a flexible full-time position as a Medical Writer.

21. Since the commencement of her employment at TREND, Ms. Tackitt excelled in her position, performing her duties in an competent and professional manner.

22. Despite her dedication to the job, and consistent performance, Ms. Tackitt was discriminated against and harassed on the basis of her sex, and was retaliated against for her complaints about discrimination and harassment, culminating in his wrongful termination on September 1, 2023.

23. During her employment, Ms. Tackitt often worked extended hours for long stretches of time, working well above and beyond forty (40) hours per week, and often worked fifty (50) to sixty (60) hours per week on last minute projects.

24. These last minute projects often included deliverables that were set by Maria Picone, Chief Executive Officer.

25. To complete these deliverables, employees were often given permission to push Objective and Key Results (OKRs) to future quarters.

26. In fact, Ms. Tackitt would ask Lauren Dougherty, Chief Operating Officer, whether priority should be given to project tasks listed on the OKRs or those that were not.

27. Ms. Dougherty would respond that she was very flexible on OKRs rolling over throughout the year and that projects that came up outside of OKRs were expected to be given priority.

28. All tasks and projects managed by Ms. Tackitt on TREND's project management board were completed on time and often ahead of schedule.

29. In or about November or December 2022, Ms. Picone asked Ms. Tackitt if she was working over 40 hours a week.

30. Ms. Tackitt indicated that she was working significantly more than 40 hours a week and that she had been doing so since she began her employment with TREND.

31. Ms. Tackitt had even worked during the few Paid Time Off (PTO) days that she took in summer 2022, as well as on most weekends.

32. Ms. Tackitt had also been unable to take her PTO during the month of December 2022 as her dedication led her to work to accommodate the absence of two data scientists.

33. Ms. Picone informed Ms. Tackitt that she could roll over her PTO days to 2023.

34. However, since Ms. Tackitt was heavily involved in many projects, which are documented on the TREND's Monday.com project management boards, it was well into the spring before Ms. Tackitt had any time to take PTO.

35. To compensate Ms. Tackitt for working well over 40 hours since her hire, TREND increased Ms. Tackitt's salary in January 2023, with no change in the number of hours she was working.

36. Throughout Ms. Tackitt's employment, she was consistently praised and assured that she was performing excellently.

37. Ms. Tackitt consistently received positive performance reviews and was considered one of the highest performing employees at TREND.

38. Indeed, her Employee Review dated January 24, 2023, states that Ms. Tackitt is "an incredible asset to the company" whose "contributions have not gone unnoticed."

39. The review further praises Ms. Tackitt in that she "consistently deliver[s] high quality pieces that convey [her] passion for [her] work, meet[s] ambitious deadlines, and ensure[s] that everything we do provides value and impact for our clients and our community."

40. TREND also acknowledged that Ms. Tackitt was a good fit for management, as the review stated, "You've expressed an interest in moving towards a formal management role and we encourage this."

41. Despite her excellent work, throughout her employment, Ms. Tackitt observed that TREND subjected female employees to differential treatment compared to male employees.

42. For example, the rights for authorship, distribution and presentation were different between males and females.

43. Among other things, TREND blatantly displayed preferential treatment towards male employee Maurice ("Max") Flurie, PhD over Ms. Tackitt.

44. Specifically, although Dr. Flurie and Ms. Tackitt contributed equally towards papers, authorship for the work in all but one poster, which was not published, always went first to Dr. Flurie in front of Ms. Tackitt.

45. Indeed, Dr. Flurie's name was always listed first, despite that, if the names were to be listed alphabetically, as equal contributors, Ms. Tackitt should have been listed first (Ms. Tackitt publishes under her maiden name - Monica Converse).

46. There was also egregiously differential treatment with respect to projects.

47. Dr. Flurie had been given ownership of several projects and was put in charge of leading them, despite having made significant and costly mistakes with respect to these projects.

48. Several of these projects had to be redone due to Dr. Flurie's mistakes, which cost TREND thousands of dollars.

49. Very tellingly, TREND never directed frustration towards Dr. Flurie for making mistakes or for leading projects while committing several mistakes.

50. Instead, TREND focused its anger on Ms. Tackitt for pointing out the mistakes – and for identifying Dr. Flurie as the one who had made those mistakes.

51. Some of these issues were large and very costly, including posters that had to be sent back and completely redesigned due to major editing and formatting issues.

52. Nonetheless, unlike Ms. Tackitt, who was subjected to frequent profane language and verbal harassment for issues that involved the entire team, including leadership, Dr. Flurie was never blamed or disciplined for making such mistakes and/or for costing the company a significant amount of money to fix his mistakes.

53. In another example of differential treatment, when Ms. Tackitt complained about a female co-worker not completing her work adequately, causing Ms. Tackitt to have to work overtime to fix the resulting errors, including late at night to meet deadlines, she was told that the two of them were like "oil and water" – a remark that certainly would not have been said to a male employee.

54. Demonstrating a pattern and practice of TREND to harass and discriminate against its female employees, Ms. Tackitt was not the only female at TREND who was subjected to discrimination and harassment on the basis of her sex.

55. A former female employee, Dr. Marisa Naujokas, was frequently subjected to verbal abuse and screaming by Christopher DeFelice, Chief Technology Officer, and ultimately resigned due to the hostile work environment.

56. It is very telling that while the female employees were frequently subjected to this harassment, the male employees were not.

57.    In another instance of TREND engaging in clear discriminatory and differential treatment, another female employee, Rachelle Cook, was initially put as the first author on a white paper.

58.    However, once she requested an accommodation, she was immediately bumped from first author to fifth – despite the fact that the work had already been sent out with her name listed first and seen by individuals outside of the company.

59.    In yet another example, a female contractor, Helen Hernandez, was dropped as an author from a manuscript during her maternity leave.

60.    Her name was only reinstated as an author due to Ms. Tackitt's insistence that she not be removed, as Ms. Tackitt reminded TREND that it would reflect poorly on the company to drop a female author while she was out on maternity leave.

61.    In or about the end of July 2023, Ms. Tackitt complained about the differential and discriminatory treatment.

62.    Specifically, Ms. Tackitt noted that it was a constant battle to be put as a front author on the works for which she had made equal contributions as the male Dr. Flurie, and questioned if it was because she was female.

63.    After her complaint of discrimination and harassment, Ms. Tackitt was subjected to immediate retaliation, as TREND abruptly began building a case against her for termination.

64.    Initially, and very tellingly, right after Ms. Tackitt complained about discrimination, she noticed that, on or about August 1, 2023, a meeting was scheduled on the calendar for the following day, August 2, 2023, between management and company counsel, with a subject of "employment legal advice."

65. In addition to the suspicious meeting suddenly taking place between the company and its legal counsel, Ms. Tackitt was also subjected to other blatant acts of retaliation.

66. For example, Ms. Tackitt was suddenly subjected to excessive micromanagement that she had never experienced prior to her complaint of discrimination.

67. Ms. Tackitt was also constantly set up for failure, as on several occasions, TREND attempted to "catch" her by making requests after work hours and then contacting her by 8:20 a.m. to confirm that she had completed the last-minute requests (an endeavor that ultimately failed, as Ms. Tackitt worked long hours overnight and ultimately did complete the requests).

68. In addition, and among other things, Ms. Tackitt was taken off her typical tasks, her emails and ideas were completely ignored (despite that TREND thereafter used several of her ideas), Mr. DeFelice refused to respond to her technology requests on messenger, and she was excluded from meetings she normally would have, and should have, attended.

69. Ms. Tackitt's supervisor, Ms. Dougherty, also began scheduling one-on-one meetings during times that were known not to be Ms. Tackitt's working hours, as Ms. Tackitt had to pick up her daughter at that time.

70. Moreover, in group messages involving Ms. Tackitt and Dr. Flurie, Dr. Flurie did not answer the messages so it all came down on Ms. Tackitt.

71. In further evidence of discrimination and retaliation, when the team thereafter missed a deadline for one of its projects, the Gout Manuscript ("manuscript"), Ms. Tackitt was singled out and blamed for the incident.

72. Ms. Tackitt was blamed despite the fact that she had actually prepared a final draft of the manuscript to send to all authors.

73. In fact, Ms. Tackitt messaged Ms. Picone; Ms. Dougherty; and Dr. Flurie regarding the finished draft of the manuscript.

74. The only response to acknowledge the completion of the draft was a short Slack message from Dr. Flurie.

75. Ms. Tackitt also tagged the five internal authors (Mr. DeFelice; Ms. Picone; Dr. Flurie; Colton Flowers, NLP Engineer; and Gary Ho, Senior Community Director) on TREND's project management board to alert the authors that the draft had been uploaded to the Monday.com project management board.

76. The draft manuscript was emailed to all external authors, as well as Dr. Robert Wassman, Chief Medical Officer.

77. Two authors – external author Ms. Helen W. Hernandez and internal author Mr. Ho – began reviewing the manuscript shortly after August 25, 2023.

78. In fact, timestamps on the document indicate that Ms. Hernandez was reviewing the manuscript on August 29, 2023, and Ms. Hernandez emailed Ms. Tackitt back with suggested edits.

79. In addition, on August 25, 2023, Mr. Ho also reviewed the manuscript and commented on the project management board that he had reviewed the finished draft and had no additions to the manuscript.

80. There is also a time mark on the Monday.com project management board that indicates that the draft was viewed by Mr. DeFelice and Ms. Picone.

81. Moreover, on August 29, 2023, during a weekly research meeting Ms. Tackitt announced the completion of the manuscript to the entire team, but it was not met with any excitement.

82. In fact, at the end of the research meeting, Mr. DeFelice asked that Dr. Flurie, Ms. Dougherty, and Ms. Tackitt remain on the call.

83. After everyone had left, instead of being excited about the completion of the manuscript and applauding Ms. Tackitt for her work, Mr. DeFelice began verbally harassing her, as if he had not expected Ms. Tackitt to complete the work, and complete it on time, after it was given to her on August 2, 2023.

84. Although it was acknowledged that the team members, as a group, were all responsible for the project stopping and starting several times throughout the year, Ms. Tackitt was specifically targeted and was the only one who was screamed at, mocked and berated for the entire project taking so long to complete and for assigning author edits to Mr. DeFelice.

85. After being verbally harassed by Mr. DeFelice on August 29, 2023, which was witnessed by COO and Head of Human Resources Lauren Dougherty, Ms. Tackitt sent a message about the harassment to Ms. Dougherty, who claimed that they were "taking her concerns seriously."

86. However, only two days later, Ms. Tackitt was subjected to the ultimate act of discrimination and retaliation – termination.

87. On September 1, 2023, Ms. Tackitt was told by Ms. Dougherty that she was being terminated on grounds of poor performance.

88. This was clearly pretext for discrimination and retaliation, as Ms. Tackitt had never been informed of any issues with her performance and had only been given praise and accolades.

89. Indeed, a fabricated performance review created *after* Ms. Tackitt's termination was riddled with inaccuracies and outright falsehoods, as several items noted as "not completed"

had actually been completed (many of which are currently posted on TREND's website with posting dates during Ms. Tackitt's employment); and a noted manuscript was ultimately rejected on October 17 because (as had often occurred), it had not been submitted correctly by Dr. Flurie, resulting in yet another costly error for the company.

90. It is further evident that Ms. Tackitt's termination was pretextual as there were several OKRs that were not completed by male employees who remained employed by TREND, while Ms. Tackitt was terminated for OKRs that would have been completed by the deadline.

91. Additional evidence of pretext is the fact that the employee handbook states that the company would use progressive disciplinary actions before dismissing an employee.

92. Notwithstanding those company rules, Ms. Tackitt was never given any prior discipline prior to her termination – or even afforded any notice of wrongdoing or an opportunity to fix any alleged issues.

93. Most tellingly, at her termination meeting, after Ms. Dougherty informed Ms. Tackitt that she was being terminated for alleged "poor performance," Ms. Picone outright admitted that Ms. Tackitt was actually being terminated for "accusing her of discrimination," as well as for accusing a male employee, Dr. Wassman, of plagiarism (even though it was part of Ms. Tackitt's job to find and report any potential plagiarism to protect TREND's reputation in the scientific community).

94. Thus, Defendant conceded that it terminated Ms. Tackitt in retaliation for having complained about discrimination.

95. In even more demonstration that the grounds given for Ms. Tackitt's termination were false, even after her termination, TREND reached out to Ms. Tackitt and requested that she provide input and further work on certain projects.

96. Specifically, when Ms. Tackitt caught several errors that would have resulted in the manuscript being desk-rejected, TREND requested her help in finding the correct requirements and information for submission (even though Dr. Flurie had again missed the deadline for submission and ultimately excluded relevant data, causing a rejection from the publisher).

97. Furthermore, despite her continued work after her wrongful termination, Ms. Tackitt continued to face retaliatory and discriminatory treatment even post-termination, as TREND has failed and/or refused to allow Ms. Tackitt authorship for her intellectual contributions and for manuscripts that she qualified for and had completed prior to her termination.

98. Such acts negatively impact Ms. Tackitt's career and future prospects, as authorship is highly significant in the field and she has been wrongfully denied authorship on her work.

99. Given her treatment during her employment with TREND, Ms. Tackitt maintains that TREND Community, PBC discriminated against her on the basis of her sex and wrongfully terminated her in retaliation for her complaints about discrimination and harassment.

100. Defendant discriminated against and harassed Ms. Tackitt because of her sex and retaliated against Ms. Tackitt for complaining of the discrimination and harassment in violation of Title VII, the PHRA, and the PFPO.

101. Defendant willfully violated Title VII, the PHRA, and the PFPO as Defendant knew that its actions violated the statutes and/or acted with reckless disregard as to whether its actions violated Title VII, the PHRA, and the PFPO.

102. As a result of the discrimination, harassment, retaliation and other wrongful conduct perpetrated against Ms. Tackitt by TREND Community, PBC, Ms. Tackitt has suffered significant financial losses including, among other things, loss of employment and loss of wages.

103. Ms. Tackitt has suffered significant financial loss, harm to her reputation in the community and other harm and damages as a direct and proximate result of the actions and inactions of the Defendant.

104. Ms. Tackitt has suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the actions and/or inactions of Defendant.

105. Defendant and its agents acted with knowledge of, or in reckless disregard of the probability that their actions and inactions would cause Ms. Tackitt to suffer emotional distress.

106. As a result of the Defendant's conduct described herein, Ms. Tackitt has incurred a significant obligation for attorneys' fees and costs of bringing this action.

### COUNT I
**Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), et seq.**

107. Plaintiff Monica Tackitt repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

108. Based on the foregoing, Defendant TREND Community, PBC engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

109. In discriminating against and harassing Ms. Tackitt because of her sex, and in retaliating against Ms. Tackitt for her complaints of discrimination and harassment, Defendant violated Title VII.

110. Defendant's violations were intentional and willful.

111. Defendant's violations warrant the imposition of punitive damages.

112. As the direct and proximate result of the aforesaid unlawful employment practices engaged in by Defendant TREND Community, PBC, Plaintiff Monica Tackitt has sustained a loss of earnings and earning potential, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

113. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

## COUNT II
### Pennsylvania Human Relations Act, 43 P.S. § 951, et seq.

114. Plaintiff Monica Tackitt repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

115. Based on the foregoing, Defendant TREND Community, PBC has engaged in unlawful employment practices in violation of the Pennsylvania Human Relations Act.

116. In discriminating against and harassing Ms. Tackitt because of her sex, and in retaliating against Ms. Tackitt for her complaints of discrimination and harassment, Defendant violated the PHRA.

117. As the direct and proximate result of Defendant's violations of the Pennsylvania Human Relations Act, Plaintiff Monica Tackitt has sustained loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

118. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

## COUNT III
## PHILADELPHIA FAIR PRACTICES ORDINANCE
### Philadelphia Code §§ 9-1100, et seq.

119. Plaintiff Monica Tackitt repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

120. Based on the foregoing, Defendant engaged in unlawful employment practices in violation of the Philadelphia Fair Practices Ordinance.

121. In discriminating against and harassing Ms. Tackitt because of her sex, Defendant violated the PFPO.

122. As the direct and proximate result of the aforesaid unlawful employment practices engaged in by Defendant, Plaintiff Monica Tackitt has sustained a loss of earnings and earning potential, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

123. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

## PRAYER FOR RELIEF

124. Plaintiff Monica Tackitt repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Monica Tackitt respectfully requests that this Court enter judgment in her favor and against Defendant TREND Community, PBC and Order:

  a. Appropriate equitable relief including reinstatement or front pay;

b. Defendant to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful discrimination, harassment and retaliation;

c. Defendant to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of its unlawful conduct;

d. Defendant to pay Plaintiff punitive damages;

e. Defendant to pay Plaintiff liquidated damages;

f. Defendant to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

g. Defendant to pay Plaintiff's costs of bringing this action and her reasonable attorneys' fees;

h. Plaintiff be granted any and all other remedies available pursuant to Title VII, the PHRA, and the PFPO; and

i. Such other and further relief as is deemed just and proper.

## JURY DEMAND

Plaintiff Monica Tackitt hereby demands trial by jury as to all issues so triable.

By: */s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
1617 John F. Kennedy Boulevard
Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff
Monica Tackitt*

Dated: December 10, 2025